IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| GIUSEPPE BOTTIGLIERI SHIPPING COMPANY S.P.A., *et al.*, | ) ) ) | **PUBLISH** |
| Petitioners, | ) ) | |
| v. | ) ) | **CIVIL ACTION 12-0059-WS-B** |
| UNITED STATES OF AMERICA, *et al.*, | ) ) ) | |
| Respondents. | ) | |

**ORDER**

This matter comes before the Court on the Government's Motion to Dismiss Petitioners' Emergency Motion and Petition for Lack of Subject Matter Jurisdiction (doc. 24). The Motion has been briefed on an expedited basis, including supplemental briefing on the applicability of the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*[1]

**I.    Relevant Background.**

Petitioners, Giuseppe Bottiglieri Shipping Company S.P.A. (the "Owner") and the M/V BOTTIGLIERI CHALLENGER (the "Vessel"), *in rem*, initiated this action to solicit judicial resolution of a stalemated negotiation between the Owner and the U.S. Coast Guard.

*A.    The Coast Guard Investigation.*

In summary, the relevant undisputed facts are as follows: On January 24, 2012, the Vessel (which is owned and operated by an Italian company, and is registered in Italy) arrived at the Port of Mobile, Alabama, to unload a cargo of steel plates. (Doc. 1, ¶¶ 4, 5.) The following day, U.S. Coast Guard officers boarded the Vessel for eight hours, during which time they interviewed the ship's master and crew members concerning possible violations of the Act to Prevent Pollution from Ships, 33 U.S.C. §§ 1901 *et seq.* ("APPS"). During those interviews,

---

[1] Because the parties' briefs reveal no material disputed facts that would require credibility determinations, the undersigned takes the Motion under submission without an evidentiary hearing. *See* Local Rule 7.3.

Coast Guard officials were allegedly informed that the Vessel was equipped with a "magic pipe" for the unlawful discharge of machinery space waste, and that chief engineer Vito La Forgia had directed the crew on at least six occasions since December 2011 to utilize the "magic pipe" to discharge such waste directly into the sea, without first passing it through required pollution prevention equipment.  Crew members are alleged to have shown Coast Guard officials the magic pipe and flange and demonstrated its operation.[2]  Apparently, the Coast Guard collected written and/or oral statements from several of the witnesses.

If such discharges occurred, and if they were not properly logged in the Oil Record Book ("ORB"), then criminal liability may attach under the APPS based on presentment of a false ORB in the United States.  *See* 33 U.S.C. § 1908(a) ("A person who knowingly violates the MARPOL Protocol, Annex IV to the Antarctic Protocol, this chapter, or the regulations issued thereunder commits a Class D felony."); 33 C.F.R. § 151.25(d) ("Entries shall be made in the Oil Record Book on each occasion … whenever any of the following machinery space operations take place on any ship to which this section applies – (1) Ballasting or cleaning of fuel oil tanks; (2) Discharge of ballast containing an oily mixture or cleaning water from fuel oil tanks; (3) Disposal of oil residue; and (4) Discharge overboard or disposal otherwise of bilge water that has accumulated in machinery spaces."); *United States v. Ionia Management S.A.*, 555 F.3d 303, 309 (2nd Cir. 2009) (holding that "the APPS's requirement that subject ships 'maintain' an ORB, 33 C.F.R. § 151.25, mandates that these ships ensure that their ORBs are accurate (or at least not knowingly inaccurate) upon entering the ports or navigable waters of the United States"); *United States v. Jho*, 534 F.3d 398, 403 (5th Cir. 2008) ("we read the requirement that an oil record book be 'maintained' as imposing a duty upon a foreign-flagged vessel to ensure that its oil record book is accurate (or at least not knowingly inaccurate) upon entering the ports of navigable waters of the United States.").[3]

---

[2]   The facts concerning information received by the Coast Guard onboard the Vessel are derived from the Affidavit in Support of Criminal Complaint and Application for Arrest Warrant submitted by Christopher R. Whitmarsh, Special Agent, Coast Guard Investigative Service, in Case Number 12-mj-00014-B in this District Court.  The Criminal Complaint and accompanying Affidavit are unsealed, a matter of public record, and a proper subject for judicial notice.

[3]   As the Coast Guard explains, even though laws prohibit "magic pipe" discharges, there are often-intractable problems of jurisdiction and proof as to whether a discharge from a (Continued)

On January 26, 2012, the Coast Guard delivered to the Vessel a letter setting forth its determination that "there is reasonable cause to believe that the [Vessel], its owner, operator, person in charge, or crew member(s) may be subject to a fine or civil penalty." (Doc. 24, Exh. A.) The Coast Guard notified the Vessel that it had requested that the United States Customs and Border Protection ("CBP") withhold the Vessel's departure clearance to leave the Port of Mobile, which CBP did. (*Id.*)[4] The January 26 letter further notified the Vessel that "[w]hen the associated investigation is complete, we will request that CBP grant departure clearance for the vessel." (*Id.*)

### B.     *Negotiations for a Surety Agreement.*

APPS furnishes vessel owners with a possible means of obtaining departure clearance, through posting of a bond or other surety. *See* 33 U.S.C. § 1908(e) ("Clearance may be granted upon the filing of a bond or other surety satisfactory to the Secretary."). After the January 26 letter, attorneys for the Owner and the Coast Guard commenced extensive (and often acrimonious) negotiations for a surety agreement that would enable the Vessel to obtain the necessary clearance to leave the Port of Mobile and resume operations, thereby staunching losses of $15,000 per day in hire, plus accrual of substantial port costs. (*See* doc. 10, ¶ 5 (enumerating Owner's alleged financial losses).) A blow-by-blow account of these discussions would be both unnecessary and unhelpful; however, two principal sticking points emerged. First, the parties disagreed as to the amount of the bond itself, with the Owner offering $500,000 and the Coast Guard demanding $750,000 as of January 30, 2012. (*See* Nichols Decl., at ¶¶ 16-17 & Exh. 2.))

---

foreign-flagged ship occurred in an area subject to U.S. jurisdiction. *See generally United States v. Abrogar*, 459 F.3d 430, 435 (3rd Cir. 2006) ("under the APPS and accompanying regulations, Congress and the Coast Guard created criminal liability for foreign vessels and personnel only for those substantive violations of MARPOL that occur in U.S. ports or waters."). As a result, these kinds of offenses are typically prosecuted as record-keeping violations, rather than as illegal discharges, *per se*. (Nichols Decl. (doc. 24, Exh. B), at ¶ 5.)

[4]     Although petitioners decry it, both agencies' authority to proceed in this manner is clearly prescribed by APPS. *See* 33 U.S.C. § 1908(e) ("[I]f reasonable cause exists to believe that the ship, its owner, operator, or person in charge may be subject to a fine or civil penalty under this section, the Secretary of the Treasury, upon the request of the Secretary [of the department in which the Coast Guard is operating], shall refuse or revoke the clearance required by section 60105 of Title 46."). That procedure appears to have been followed to the letter here.

On February 3, 2012, the Coast Guard reduced its bond demand to $700,000, which the Owner promptly rejected as a "non-starter." (*See* Chalos Supp. Decl. (doc. 27, Exh. 1), ¶ 4 & Exh. B.)

Second, the parties could not reach an accord on provisions for the eight crew members whose presence in Mobile the Coast Guard requires as its APPS investigation proceeds. Specifically, the parties clashed as to the extent of the Owner's financial responsibilities to those crew members for wages, housing and *per diem* expenses. Slicing through the rhetoric, distortions and self-serving characterizations, the state of the negotiations appears to be as follows: On February 3, 2012, the Owner offered to arrange and pay for reasonable hotel accommodations, total wages, medical benefits, and a *per diem* allowance of $40/day for the eight crew members for a period "not to exceed sixty (60) days or as otherwise ordered by the Court." (Chalos Supp. Decl., ¶ 4 & Exh. B.)[5] The Coast Guard countered later that day with a proposal to enlarge the 60-day period of housing and living expenses to 180 days. (*Id.*)[6] Again, that counterproposal was summarily rejected by the Owner on February 3, 2012. (*Id.*)

Petitioners' position is that, following this failed exchange of proposals on February 3, 2012, there have been no further substantive negotiations concerning the proposed security agreement. (Chalos Supp. Decl., ¶¶ 5-12.) The Government contends that this is false, and that as recently as February 13, 2012, the Owner attempted to rekindle settlement negotiations. (Doc. 30, at 3.) Tellingly, however, the Government does not suggest that the Coast Guard has re-engaged the Owner in surety agreement negotiations or altered its bargaining position one whit

---

[5] To be clear, the Owner was not offering to make these payments for the crew's welfare with no strings attached. To the contrary, the Owner indicated that it would undertake these responsibilities only "provisionally" and "in the first instance," while reserving the right "to seek recovery of such costs and other damages" from the Coast Guard or others, pursuant to 33 U.S.C. § 1904. (*Id.*) In other words, the Owner would reserve the right to sue to get these crew payments back from the Government or a third party.

[6] The source of any 180-day requirement is unclear, in light of recent authority emanating from this very District Court. *See Mercator Lines Limited (Singapore) PTE.LTD, et al.*, Misc. No. 11-00024-CG-C (S.D. Ala. Oct. 25, 2011) (*slip op.*) (ordering Government to conduct detained crew member's deposition in the next 45 days and to appear thereafter to show cause why petitioner should not be released to his homeland pursuant to 18 U.S.C. § 3144). Upon the Government's appeal, the *Mercator* Order was affirmed by Judge Granade on November 18, 2011. (Doc. 2, Exh. U.) Pursuant to *Mercator*, it seems extraordinarily unlikely that the subject crewmen could possibly remain in this jurisdiction for a time period anywhere approaching 180 days, so the Coast Guard's insistence on such a term is curious.

in response to those overtures. Thus, it is clear that the Coast Guard has not wavered in the least from the demand it communicated to the Owner on February 3, 2012 (*i.e.*, the $700,000, and the 180-day arrangement for crew members' expenses), nor is there any indication that it is contemplating doing so. By all appearances, the February 3 demand was (and still remains) the Coast Guard's last and final offer for a surety agreement under § 1908(e).

### C. *The Present Status of the Eight Crew Members.*

Even while the Owner and Coast Guard were attempting to negotiate terms to allow the Vessel to receive clearance to leave the Port of Mobile and continue with its charter hire responsibilities, events moved swiftly as to the eight subject crew members.[7] On February 9, 2012, a Criminal Complaint and Arrest Warrant were issued for Vito La Forgia (the Vessel's chief engineer) in this District Court, alleging that he had provided false statements to the U.S. Coast Guard on January 25, 2012, in violation of 18 U.S.C. § 1519. (*See* Case No. 12-mj-00014.) La Forgia was arrested and had an initial appearance before Magistrate Judge Bivins on February 9, 2012, following which he was allowed to remain free on conditions of release, including surrendering his passport and refraining from travel outside this judicial district. As for the other seven crew members (Mario Salierno, Papy Paalisbo Bucol, Stephen Carrillo Mondigo, Donald Dinulma Tidang, Geoffrey Rasay Bagcal, Mauro Serra, and Rey Dato-On Arebejo), Judge Bivins executed material witness warrants for their arrest on February 10, 2012. (*See id.*) Those crew members appeared in court later that day, and were released, subject to conditions that they surrender their passports and remain in Mobile. (Doc. 28.)

The Court understands that all eight of these individuals are no longer residing aboard the Vessel and that none of them are presently incarcerated, but are being housed in a local hotel. Earlier this week, the Owner reached an agreement with independent counsel for each of the crew members, pursuant to which the Owner agreed to continue paying those crew members' total wages and benefits through the earlier of March 30, 2012 or the conclusion of those individuals' depositions pursuant to Rule 15, Fed.R.Crim.P. (*See* doc. 31.)

---

[7] Separate counsel have been appointed or retained for each of these crew members, two of whom (Mario Salierno and Mauro Serrah) have appeared and sought leave to intervene in this matter.

**II.     Analysis.**

The Government has moved for dismissal of this action in its entirety for lack of subject matter jurisdiction. To a great extent, the Motion to Dismiss focuses on the judicial review provisions of APPS, as set forth in 33 U.S.C. § 1910.[8] By Order (doc. 29) entered on February 13, 2012, the undersigned concluded that judicial review under § 1910 is inappropriate and unavailable because (i) petitioners do not invoke the § 1910 judicial review provisions and do not purport to be bringing their Emergency Motion and Petition pursuant to § 1910(a); and (ii) in any event, petitioners have not satisfied the 60-day notice provision that is a condition precedent to instituting suit under § 1910(a).[9] (*See* doc. 29, at 5-7.) Accordingly, jurisdiction cannot be conferred by the judicial review provisions of APPS because petitioners do not travel under that statute and have not complied with necessary notice prerequisite. The authority (if any) for this Petition must originate from another source.

   *A.     The Administrative Procedure Act.*

The Emergency Motion and Petition identifies as a jurisdictional foothold the Administrative Procedure Act ("APA"), and particularly its provision that "[a]gency action made reviewable by statute and ***final agency action for which there is no other adequate remedy in a court are subject to judicial review***." 5 U.S.C. § 704 (emphasis added). At the Court's directive, the Government filed a supplemental brief on the APA's applicability to this dispute.[10]

---

[8]   That statute provides, in part, that "any person having an interest which is, or can be, adversely affected, may bring an action on his own behalf … (1) against any person alleged to be in violation of the provisions of this chapter, or regulations entered hereunder; [or] (2) against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under this chapter which is not discretionary with the Secretary." 33 U.S.C. § 1910(a).

[9]   That notice provision reads, in part, as follows: "No action may be commenced under subsection (a) of this section … prior to 60 days after the plaintiff has given notice, in writing and under oath, to the alleged violator, the Secretary concerned or the Administrator, and the Attorney General." 33 U.S.C. § 1910(b)(1).

[10]   To be clear, it is well-established that the APA "is not a jurisdiction-conferring statute," that "the jurisdictional source for an action under the APA is the 'federal question' statute," and that the APA's judicial provisions provide "a limited cause of action for parties adversely affected by agency action." *Lee v. U.S. Citizenship and Immigration Services*, 592 F.3d 612, 619 (4th Cir. 2010) (citations and internal quotation marks omitted). But if this dispute does not fall within the APA's judicial review provisions, then there is no right of action under that statute and, hence, no jurisdiction. The ultimate question, then, is whether petitioners'
(Continued)

As an initial matter, the Government argues that there is no "final agency action." In an APA challenge, "federal jurisdiction is … lacking when the administrative action in question is not 'final' within the meaning of 5 U.S.C. § 704." *National Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003). The Government disputes the finality of the Coast Guard's position on the surety agreement, insisting that "surety negotiations are on-going." (Doc. 30, at 3-4.) All indications are to the contrary. Indeed, the record reflects that the Coast Guard presented an ultimatum to the Owner on February 3, to-wit: If you want departure clearance for the Vessel, you must pay a $700,000 bond and agree to cover crew members' wages and expenses for 180 days. The Government has not suggested – and the record does not show – that the Coast Guard established these terms on a tentative or interlocutory basis, that it is amenable to further negotiation of them, or that it has been even slightly receptive to petitioners' recent efforts to reopen those discussions. Under any reasonable interpretation, the Coast Guard's final, non-negotiable, take-it-or-leave-it demand must satisfy the "final agency action" jurisdictional prerequisite for an APA challenge. *See Fanin v. U.S. Dep't of Veterans Affairs*, 572 F.3d 868, 877 (11th Cir. 2009) ("To be considered 'final,' an agency's action: (1) must mark the consummation of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature; and (2) must be one by which rights or obligations have been determined, or from which legal consequences will flow.") (citations omitted).[11]

Next, the Government maintains that APA review is unavailable here because "federal courts lack jurisdiction over administrative action where … agency action is committed to agency discretion by law." *Norton*, 324 F.3d at 1236; *see also* 5 U.S.C. § 701(a)(2) ("This

---

claims lie within the APA's "limited cause of action." If not, then they cannot sustain their Petition by reliance on the APA.

[11]   In arguing otherwise, the Government suggests that there can be no final agency action here because the Owner has not completed the administrative appeals process. Yet the Government's own brief concedes that "[o]nce the Coast Guard takes final agency action, there is a procedure for appealing that action." (Doc. 30, at 3 n.2.) So, by the Government's own reckoning, the "final agency action" is the Coast Guard decision that is appealed, as contrasted with the Coast Guard's post-appeal decision. If the Government agrees that this appeal process is available to the Owner now, then by implication there must be a "final agency action" to appeal.

chapter applies … except to the extent that … agency action is committed to agency discretion by law."). "[T]he primary focus of section 701(a)(2) is whether the governing statute provides the courts with 'law to apply'." *Forsyth County v. U.S. Army Corps of Engineers*, 633 F.3d 1032, 1040 (11th Cir. 2011). What this means is that, if Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is 'law to apply' under § 701(a)(2), and courts may require that the agency follow that law; if it has not, then an agency … decision [is] 'committed to agency discretion by law' within the meaning of that section." *Forsyth County*, 633 F.3d at 1040 (citing *Heckler v. Chaney*, 470 U.S. 821, 834-35, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985)). As a practical matter, then, § 701(a)(2) means that "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 1041 (citing *Heckler*, 470 U.S. at 830).

The gravamen of the Emergency Motion and Petition is petitioners' position that the Coast Guard has "arbitrarily, capriciously, and purposefully refused to negotiate in good faith and [has] failed to accept a reasonable bond or other form of surety in accordance with the clear statutory requirements of 33 U.S.C. § 1908(e)." (Doc. 1, at 17.)[12] But § 1908(e) says merely that "[c]learance may be granted upon the filing of a bond or other surety satisfactory to the Secretary." *Id.* On its face, this language confers enormously broad discretion on the Coast Guard to decide, in the first place, whether to grant clearance at all (hence the statement that clearance <u>may</u> – not "must" or "shall" – be granted) and, if so, on what terms (hence the allowance for bond or other surety "satisfactory to the Secretary").[13] From the text of § 1908(e), a reviewing court would have no meaningful standard at all against which to judge whether the Coast Guard's exercise of its discretion was appropriate or not. Congress did not require the Coast Guard to accept a bond or other surety in any case. It did not grant an absolute right to a vessel owner to obtain departure clearance. It did not outline (even in the broadest brushstrokes)

---

[12]   Petitioners have stressed this point, writing that "the Emergency Petition seeks the Court's proper intervention to review the Coast Guard's unreasonable, prejudicial, and impermissible overreach of its agency authority under 33 U.S.C. § 1908(e)." (Doc. 27, at 5.)

[13]   In their brief, petitioners balk that "[w]ith regard to APPS, the statute simply does not give the Coast Guard the power to self-servingly interpret the meaning of 'surety satisfactory to the secretary.'" (Doc. 27, at 7.) On the contrary, its plain language appears to do just that.

the parameters for what form or amount a bond or other surety should take. It did not impose a reasonableness limitation on the bond or other surety fixed by the Coast Guard. It did not even specify what a "bond or other surety" is, or clearly bar the Coast Guard from including non-financial terms in § 1908(e) surety agreements.[14] A court could not possibly evaluate what is or is not actually "satisfactory" to the Coast Guard, save perhaps by cross-examining the Commandant of the Coast Guard about his own subjective beliefs and perceptions.

As noted, APA review of a final agency decision is unavailable where there is no law to apply (*i.e.*, where Congress has not indicated an intent to circumscribe agency enforcement discretion, and has not provided meaningful standards for defining the limits of that discretion). That is precisely the case here. At its core, the Emergency Motion and Petition is an attempt by petitioners to have this Court force the Coast Guard to restore the Vessel's departure clearance and to fix terms of a mandatory surety agreement that are less onerous than those proposed by the Coast Guard. But Congress expressly afforded the Coast Guard virtually unfettered latitude to decide whether or not to grant clearance, and if so, what terms of "bond or other surety" would be "satisfactory" to it. What this Court deems "satisfactory" and what the Coast Guard deems "satisfactory" may be very different things. Congress has given this Court no "law to apply" and no meaningful standards to review the Coast Guard's inherently subjective determination. It is

---

[14] A recurring theme in petitioners' filing is that a "bond or other surety" means money only, and that the Coast Guard's insistence on non-financial terms violates § 1908(e). But Congress did not unambiguously prohibit the Coast Guard from imposing non-financial terms on vessel owners. The phrase "bond or other surety" is ambiguous. If "bond" equates to the posting of money, then logically "other surety" must refer to some form of assurance other than money; otherwise, it would be redundant of the term "bond." *See, e.g., United States v. Aldrich*, 566 F.3d 976, 978 (11th Cir. 2009) ("statutes should be construed so that no clause, sentence, or word shall be superfluous, void, or insignificant") (citation and internal quotation marks omitted); *United States v. Fuentes-Rivera*, 323 F.3d 869, 872 (11th Cir. 2003) ("when interpreting a statute, it is necessary to give meaning to all its words so that no words shall be discarded as being meaningless, redundant, or mere surplusage") (citation and internal quotation marks omitted); *Black's Law Dictionary* (9th ed. 2009), at 1580 (defining "surety" as "[a] formal assurance; esp., a pledge, bond, guarantee, or security given for the fulfillment of an undertaking"). Nothing in that statutory language would plainly forbid an interpretation of "surety" as encompassing assurances for the welfare and availability of crew members, in addition to a cash bond. The point is that the statutory phrase "bond or other surety satisfactory to the Secretary" gives this Court no legal standard to apply in reviewing the Coast Guard's decision on the surety terms it proposed in this case.

beyond cavil that "[t]he court is not empowered to substitute its judgment for that of the agency … when the relevant statute leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances." *Forsyth County*, 633 F.3d at 1041 (internal citations and quotation marks omitted). Yet that is, in effect, what petitioners are asking the Court to do.

For these reasons, the Court concludes that petitioners' request for judicial review of the take-it-or-leave-it surety agreement terms proposed by the Coast Guard lies outside the scope of the Administrative Procedure Act, inasmuch as the Coast Guard's actions are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). There is no law to apply and no meaningful standard against which to judge the Coast Guard's exercise of its discretion under 33 U.S.C. § 1908(e) in setting terms for a surety agreement under which customs clearance would be granted to the Vessel; therefore, that decision is not subject to judicial review under the APA, and the APA cannot provide a jurisdictional basis for the Emergency Motion and Petition.[15]

### B. Other Asserted Bases for Jurisdiction.

Having confirmed that petitioners have not invoked the judicial review provisions of APPS (or satisfied the notice prerequisite to such review) and having determined that APA review is not available here, the Court now turns to petitioners' other asserted grounds for requesting judicial intervention in their stalled negotiations with the Coast Guard.

For starters, petitioners contend that "[t]his Court absolutely has the authority to review any statute whose meaning and interpretation is at issue." (Doc. 27, at 5.) However, the mere fact that a federal agency and a private entity disagree over the meaning of a statute does not necessarily confer jurisdiction on federal courts to adjudicate the dispute; rather, there must be a legal vehicle for review of the agency's interpretation. With neither APPS nor the APA providing for judicial review of the agency's construction of § 1908(e) under the circumstances

---

[15] *Cf. Webster v. Doe*, 486 U.S. 592, 600, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (APA review precluded under § 701(a)(2) where Congress authorized agency to act whenever it "shall deem such termination necessary or advisable," such that standard "fairly exudes deference to the Director" and "foreclose[s] the application of any meaningful judicial standard of review"); *Drake v. F.A.A.*, 291 F.3d 59, 72 (D.C. Cir. 2002) (finding no APA claim under § 701(a)(2) where statute "gives the FAA virtually unbridled discretion over such decisions" and the "only statutory reference point is the Administrator's own beliefs," such that "a court has no meaningful standard against which to judge the agency's exercise of discretion").

of this case, it is incumbent on petitioners to identify some other provision or principle creating a private right of action or right to judicial review of the Coast Guard's application of § 1908(e) to its negotiations with the Owner.  This they have not done.  Mere generalities about courts' authority to review and interpret statutes are unavailing.

Next, petitioners argue that "[t]he District Court is empowered to act to prevent a manifest injustice or the abridgement of Petitioner's due process rights."  (Doc. 27, at 7.)  There is no indication of "manifest injustice" here.  The Coast Guard and the Owner have attempted to negotiate a surety agreement.  The Owner has declined the Coast Guard's final offer, although it could decide otherwise if it chooses.  Despite petitioners' rhetoric about statutory and constitutional rights, the heart of the dispute is the Coast Guard's demand that bond be set at $700,000, and the Owner's belief that $500,000 is sufficient.  This is not manifest injustice.[16]  And there has been no abridgement of petitioners' due process rights.  Petitioners enjoy a due process right to seek reconsideration or bring an administrative appeal of the Coast Guard's decision concerning  surety agreement terms, and to potential judicial review (at a minimum, in the form of an action for damages arising from unreasonable detention or delay of the Vessel).  To date, however, they have attempted to circumvent these procedures by filing a lawsuit targeted outside the APPS administrative and judicial review scheme.  Petitioners have abundant process available to them and have not been deprived of it; rather, they have simply chosen not to avail themselves of that process.  Such a voluntary choice does not equate to a constitutional deprivation warranting immediate judicial intervention, even assuming petitioners had brought a § 1983 cause of action for violation of due process (which they have not).

---

[16] To be sure, petitioners protest that the Coast Guard is violating the Constitution by requiring "a waiver of rights and defenses" and "infring[ing] upon the rights and liberties of foreign seafarers."  (Doc. 27, at 7.)  Neither of these characterizations is accurate.  Even under the terms demanded by the Coast Guard, the Owner and Vessel retain the full panoply of rights and defenses in any civil, criminal or administrative proceedings that the Government might initiate against them.  As for the crew members, objections predicated on their "rights and liberties" are a red herring at this juncture.  The rights and liberties of those individuals are more than adequately protected, given that (i) all eight of them have been served with arrest or material witness warrants, are represented by independent counsel, and are under the active supervision of this District Court at this time; and (ii) the Owner has separately agreed to pay total wages and benefits to these individuals through the end of March 2012.

As another basis for jurisdiction, petitioners argue that subject-matter jurisdiction is proper when "the legal question is 'fit' for resolution and delay means hardship, or when exhaustion would prove 'futile.'" (Doc. 27, at 10.) This argument is misplaced. As a statement of black-letter law, it is correct that the Supreme Court has recognized the cited exceptions to the general requirement of exhaustion of administrative remedies. *See Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 13, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000) ("Doctrines of 'ripeness' and 'exhaustion' contain exceptions, however, which exceptions permit early review when, for example, the legal question is 'fit' for resolution and delay means hardship, … or when exhaustion would prove 'futile.'") (citations omitted). But petitioners misapprehend the procedural posture of this case. The Court's jurisdictional determinations are not predicated on a lack of ripeness or exhaustion. As noted in the February 13 Order and confirmed *supra*, petitioners do not purport to bring this action under the judicial review provisions of APPS. They have not invoked § 1910(a).[17] There simply is no APPS claim presented in their Emergency Motion and Petition. That being the case, petitioners' failure to exhaust administrative remedies that are a prerequisite to suit under § 1910(a) is inconsequential. Stated differently, it makes no difference whether petitioners were or were not excused from satisfying exhaustion requirements for a claim that they unquestionably have not presented in this action.[18]

Petitioners also urge the Court to find that jurisdiction is proper based on federal courts' "exclusive, original jurisdiction to consider alleged violations of federal criminal statutes." (Doc. 27, at 12.) It is true that "[t]he district courts of the United States shall have original

---

[17] *See* February 13, 2012 Order (doc. 29) at 6-7 ("Nowhere in the lengthy Emergency Motion and Petition (doc. 1) do petitioners purport to be bringing a legal action under 33 U.S.C. § 1910(a); therefore, whether they could have done so or not is a question of no more than academic interest.").

[18] Besides, petitioners have not shown that submitting to the administrative appeal process would be futile, under the particular facts and circumstances of this case, given the specific sticking points in this negotiation and the present status of these crewmen. And the suggestion that there is a "hardship imposed by the Coast Guard upon foreign seafarers who would be required to remain in the Southern District of Alabama for an indefinite period of time" (doc. 27, at 11) is a non-issue in the present procedural posture of this action. As noted *supra*, given recent developments in the criminal proceeding, there are more than adequate procedural safeguards in place to protect these crew members from the "hardship" contemplated by petitioners, even without immediate judicial review of the Vessel and Owner's claims.

jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." 18 U.S.C. § 3231. But the terms and conditions under which the Vessel may receive customs clearance to leave the Port of Mobile are not a criminal matter. The alleged wrongs by the Coast Guard in those negotiations are not "offenses against the laws of the United States." And § 3231 does not create a private right of action (separate and apart from the APA) for any person who desires judicial interpretation of any federal statute with a criminal component. This asserted basis for the Emergency Motion and Petition is baseless.

Finally, petitioners contend that jurisdiction over their Emergency Motion and Petition is proper pursuant to Rule E of the Supplemental Rules for Admiralty or Maritime Claims. This argument fails for at least three reasons. First, on its face, Supplemental Rule E "applies to actions in personam with process of maritime attachment and garnishment, actions in rem, and petitory, possessory, and partition actions." Supplemental Rule E(1). This case is none of those things. The Coast Guard has not attached or arrested the Vessel, is not seeking forfeiture of the Vessel, or the like; rather, it has simply arranged for the Vessel's customs clearance to be suspended unless and until bond or other surety satisfactory to the Coast Guard is made. The Supplemental Rules say nothing about customs clearances or the terms under which the Coast Guard and CBP must or may grant them; therefore, those Rules have no application here. *See Wilmina Shipping AS v. United States*, 2010 WL 2079905, *3 (S.D. Tex. May 19, 2010) (finding no jurisdiction under Supplemental Admiralty Rule E, and reasoning that "[t]he action at issue here is not an attachment pursuant to a civil action, but rather a withholding of customs clearance under 33 U.S.C. § 1908(e)," which "procedures are specific to the APPS statute, and are not supplemented by civil Admiralty Rules governing actions *in rem* and *quasi in rem*").

Second, the general terms of Supplemental Rule E cannot trump the specific provisions of 33 U.S.C. § 1908(e) which are at issue in the parties' negotiations. *See generally Hinck v. United States*, 550 U.S. 501, 127 S.Ct. 2011, 167 L.Ed.2d 888 (2007) (citing "well-established principle" that "a precisely drawn, detailed statute pre-empts more general remedies") (citations omitted); *Nguyen v. United States*, 556 F.3d 1244, 1253 (11th Cir. 2009) ("The canon is that a specific statutory provision trumps a general one.").[19] In other words, Congress having created a

---

[19] These authorities are apt, inasmuch as it is generally regarded that "the Federal Rules of Civil Procedure have statutory effect." *U.S. for Use of Tanos v. St. Paul Mercury Ins.* (Continued)

specific statute addressing surety agreements for customs clearances, the general provisions of the Supplemental Rules must yield to the more specific § 1908(e) provisions on that topic.

Third, petitioners do not identify a single case authority, statutory provision, rule or regulation that has <u>ever</u> recognized applicability of the Supplemental Rules to afford a vessel owner an "absolute right to obtain the release of the vessel upon the posting of adequate security" (doc. 27, at 16) where the Coast Guard and CBP are withholding customs departure clearance under the APPS.[20]  This Court will not be the first, particularly when the plain language of § 1908(e) refutes the existence of any such absolute right.

## III.   Conclusion.

Petitioners find themselves in an unenviable position.  The Owner and crew members are under criminal investigation for violation of the record-keeping requirements of the APPS.  The Coast Guard has arranged for the withholding of the Vessel's clearance to leave the Port of Mobile, pending bond or other surety satisfactory to the Coast Guard, as provided by 33 U.S.C. § 1908(e).  As a result, the Vessel is trapped in a foreign port far from home.  Every day, the Owner is losing money on charter hire, port fees, and other expenses.  And the Coast Guard is insisting on terms of a surety agreement that the Owner finds distasteful, particularly the imposition of a $700,000 bond and coverage of eight crew members' living expenses and wages for up to 180 days.  The Owner thinks these terms are excessive.

---

*Co.*, 361 F.2d 838 (5th Cir. 1966); *see also Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Company, Inc.*, 313 F.3d 385, 392 (7th Cir. 2002) ("For federal rules of procedure have the force of statutes.").

[20]  Petitioners argue that "[i]t is indisputable that reliance on Supplemental Rule E(5) has already been conceded as being both appropriate and applicable to these matters by the Coast Guard."  (doc. 27, at 16-17.)  The Court disagrees.  At most, petitioners show that the Coast Guard proposed, as a part of the surety agreement, that the parties agree that Supplemental Rule E(5) would apply to attach the Government's criminal and civil penalty claims to the security paid by the Owner.  To propose that the parties adopt Supplemental Rule E(5) as a matter of contract is not to concede that Supplemental Rule E(5) would apply in the absence of any such contractual agreement.  And to say that Supplemental Rule E(5) governs the legal effect of the security (once paid) vis a vis the Government's criminal and civil penalty claims is a far cry from admitting that Supplemental Rule E(5) governs the underlying negotiations, trumps 33 U.S.C. § 1908(e), or gives the Owner an absolute right to obtain customs clearance for the Vessel for any security the Owner deems reasonable.

Confronted with these circumstances, the Owner has options. It could accede to the terms demanded by the Coast Guard, even though it thinks them unreasonable.[21] Alternatively, the Owner could request reconsideration and/or appeal the surety agreement terms proposed by the Coast Guard by invoking the procedure specified in 46 C.F.R. Subpart 1.03. Or it could provide the Coast Guard and Attorney General with the 60-day notice required for judicial review under 33 U.S.C. § 1910(b)(1) and initiate judicial review proceedings under APPS when that period expires, with an eye towards seeking relief from exhaustion requirements on futility grounds and/or recovering damages under § 1904(h) for what it perceives as the unreasonable detention or delay of the Vessel by the Coast Guard. All of these options are imperfect, but they are available options nonetheless.

The Owner selected none of these avenues, but instead would create a brand-new remedy with no basis in the APPS or the case law, by asking this Court to enter the fray to force the Coast Guard to accept surety agreement terms that the Owner thinks are reasonable. The trouble is that the Owner is attempting to jam a square peg into a round hole – it just does not fit. Nothing in the APPS furnishes vessel owners with the option of seeking a "second opinion" from the federal courts if they are dissatisfied with the Coast Guard's offer in a § 1908(e) surety agreement negotiation. Nor does the APA provide a vehicle for challenging the Coast Guard's exercise of its virtually unbounded, standardless discretion in deciding what surety agreement terms are "satisfactory" to it. The Supplemental Admiralty Rules have no application to the withholding of a customs clearance in an APPS case. The other jurisdictional pathways identified by petitioners are not available in this case and/or do not give rise to a private right of action to have this Court interpret the meaning of § 1908(e) or review a Coast Guard application of that statute with which petitioners disagree. And the argument that this Court should throw out all of these legal considerations and step in to protect the basic human rights and liberties of the affected crewmen is a red herring, as this matter stands today.[22]

---

[21] This avenue would have the advantage of allowing the Vessel to obtain customs clearance, to leave Mobile immediately, and to resume economically productive activities for the benefit of the Owner in short order.

[22] Again, all eight of these crewmen have been served with warrants in an ongoing criminal proceeding in this District Court. All have appeared before a Magistrate Judge and are subject to ongoing supervision. All have received independent counsel. And all are being paid (Continued)

For all of these reasons, it is **ordered** as follows:

1. The Government's Motion to Dismiss (doc. 24) is **granted**;
2. The Emergency Motion and Petition (doc. 1) is **dismissed without prejudice** for lack of jurisdiction and/or a private right of action; and
3. A separate judgment will be entered.

DONE and ORDERED this 17th day of February, 2012.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

their full wages and benefits through their Rule 15 depositions or the end of March 2012 to allow sufficient time for their participation as material witnesses to the criminal case to be concluded (unless of course they become the subject of criminal complaints or indictments in the interim, as has occurred with respect to Chief Engineer La Forgia).  The point is that these crew members' rights and interests are being fully protected today, and there is no discernible need for judicial intervention in redundant civil proceedings to safeguard them further.